H. Gillis GRAHAM, d/b/a Graham Construction Company et al., Appellants,

v.

**SAN ANTONIO MACHINE AND SUPPLY CORPORATION, Appellee.**

No. 14539.

Court of Civil Appeals of Texas.

San Antonio.

May 31, 1967.

Rehearing Denied Sept. 13, 1967.

Wiley & Thornton, Dayton G. Wiley, Lewin Plunkett, San Antonio, Charles C. Smith, Cameron, for appellants.

Lloyd, Lloyd, Dean & Ellzey, Alice, McGown, McClanahan & Hamner, San Antonio, for appellee.

CADENA, Justice.

This is an appeal from a judgment in favor of a subcontractor and the subcontractor's materialman against a prime contractor on a public construction project and his surety on a payment bond executed in conformity with the provisions of the McGregor Act, Article 5160, Vernon's Ann. Civ.St. (1962).

Appellant, H. Gillis Graham, d/b/a Graham Construction Company, herein called

"Graham," was the prime contractor under a contract with the Alice Water Authority for the construction of a water supply system and treatment plant in the City of Alice, Jim Wells County. Appellant National Surety Corporation, herein called "National," was the surety on the payment bond furnished by Graham. Appellee, San Antonio Machine and Supply Corporation, herein referred to as "SAMSCO," as subcontractor, contracted with Graham to fabricate and erect, in connection with the Alice water project, a storage tank and a wash tank for the sum of $64,000.00. In addition, SAMSCO furnished Graham, on what is referred to in the record as an open account, materials and supplies used by Graham in the performance of his contract with the Alice Water Authority. Eureka Machine Tools, Inc., herein called "Eureka," furnished materials to SAMSCO which were used in the construction of the Alice water project.

On November 9, 1964, Graham filed this action, in the form of a bill of interpleader, in the District Court of Jim Wells County, alleging that SAMSCO had substantially performed the work called for in its contract with Graham, as a result of which Graham was indebted to SAMSCO in the sum of $55,010.63. The pleading then recited that rival and conflicting claims, including a claim by Eureka in the amount of $9,203.43, had been made upon Graham for moneys due SAMSCO. The other rival claimants named by Graham have filed disclaimers and are no longer parties to this litigation.

Meanwhile, on a date not revealed by the record in this case, SAMSCO had been adjudged bankrupt, and on November 18, 1964, the bankrupt court, being the United States District Court for the Western District of Texas, San Antonio Division, issued its order enjoining all parties to the interpleader suit from continuing the litigation. National, which at this stage of the proceedings had not been made a party to this suit, was not named in such stay order.

Thereafter, on February 1, 1965, Eureka filed in this case what it designated an "intervention," alleging that SAMSCO was indebted to it from materials furnished SAMSCO and used in construction of the Alice water project, in the sum of $9,203.43, and that to this extent its claim to the funds held by Graham was superior to that of all other claimants. In addition, Eureka alleged that National had executed, as surety for Graham, the payment bond described above, and prayed for recovery from Graham and National. Eureka also sought recovery of attorney's fees.

On April 5, 1965, National having filed no answer to Eureka's claim, the trial court entered an interlocutory default judgment in favor of Eureka against National in the sum of $9,203.43, plus $500.00 for attorney's fees.

On August 2, 1965, the stay order entered by the United States District Court in the SAMSCO bankruptcy proceedings was terminated. On August 3, 1965, SAMSCO filed its answer in Eureka's suit, including a cross-action against Graham and National, alleging that Graham was indebted to SAMSCO in the sum of $62,081.67 for labor and materials furnished Graham by SAMSCO in connection with the Alice project.

On August 26, 1965, National filed its answer to SAMSCO's cross-action, and on November 5, 1965, National filed its motion to set aside the default judgment rendered against it and in favor of Eureka on April 5, 1965. This motion to set aside the default judgment was denied by the trial court on December 20, 1965.

On March 2, 1966, Graham and National filed their amended answer to SAMSCO's cross-action, including a cross-action against SAMSCO for damages allegedly resulting from SAMSCO's delay in fabricating and installing the water tanks. On March 16, 1966, after a trial without a

jury, the trial court entered judgment as follows:

1. The default judgment in favor of Eureka against National was made final.

2. Eureka was granted recovery against SAMSCO in the sum of $9,203.43, plus $1,000.00 as attorney's fees. SAMSCO does not complain of this portion of the judgment.

3. SAMSCO was granted recovery of $62,081.67 on its cross-action against Graham and National, but National was allowed a credit in the amount of $4,650.00, representing the extent of the claim perfected by Eureka against National under the provisions of Article 5160. SAMSCO was granted a further recovery of $12,000.00 against Graham for attorney's fees.

Some of appellants' points of error assail the rendition of the default judgment in favor of Eureka, with the remainder being directed to the rendition of the judgment in favor of SAMSCO. We shall discuss the Eureka and SAMSCO claims separately.

## 1. THE JUDGMENT IN FAVOR OF EUREKA

National contends that the trial court erred in rendering default judgment in favor of Eureka because Eureka's pleadings did not state a cause of action against National; that the trial court erred in refusing to set aside the interlocutory default judgment; and that, in any event, Eureka was not entitled to recover, as against National, attorney's fees.

### a. *The Entry of the Default Judgment*

Eureka alleged, in substance, that it had furnished materials to SAMSCO which were used in connection with the Alice water project described in Graham's petition, and that, therefore, Graham and SAMSCO were indebted to it in the sum of $9,203.43. Eureka further alleged that National had issued a payment bond in connection with such project; that National was obligated to pay Eureka for the mate-

rials furnished; and that Eureka had complied with the legal requirements for judgment against National.

Eureka's pleadings, by reference to Graham's petition in interpleader, show that the project in question was a public construction project in which Graham was the "prime contractor," and that such project was subject to the provisions of Article 5160, which require that the prime contractor furnish a payment bond. This sufficiently identified Graham as the principal on the payment bond issued by National. In determining whether pleadings are sufficient to support a default judgment, the claimant's pleading will be tested by the rules which would have been applied under the old general demurrer practice. Odom v. Pinkston, 193 S.W.2d 888 (Tex.Civ.App., 1946, writ ref'd n. r. e.). That is, the default judgment will stand if the pleadings give fair notice to the adversary of the nature of the claim against him, even though the pleadings would be vulnerable to attack by special exception. 4 McDonald, Texas Civil Procedure, p. 1372 (1950). Tested by these rules, Eureka's pleadings, although cast in general terms which, perhaps, would not have withstood challenge by special exception, were sufficient, except the portion seeking recovery of attorney's fees, to state a cause of action against National.

### b. *Refusal to Set Aside Default Judgment*

National contends that the failure of its attorney, Charles C. Smith, Jr., Esq., to file an answer to Eureka's claim was due to a good faith belief that the filing of an answer would constitute a violation of the stay order issued by the United States District Court in connection with the SAMSCO bankruptcy proceedings.

Even if it be assumed that National's fear of violating the stay order would excuse its failure to answer Eureka's claim while the stay order remained in effect, we do not believe that the trial court erred in refusing to set aside the default judgment rendered in favor of Eureka. As al-

ready pointed out, the stay order was dissolved on August 2, 1965. National did nothing with respect to the Eureka claim until November 5, 1965, some 95 days after the stay order was terminated, when it filed its motion to set aside the default judgment. There is nothing in the record to justify this lengthy period of inaction on the part of National. The burden was on National to show that, after it acquired notice of the entry of the default judgment, it acted promptly to protect its interests. Since there is nothing in the record to indicate when National became aware of the entry of the judgment, it failed to sustain its burden of showing that it acted with due dilience in protecting its rights, and that its delay until November 5, 1965, was not due to its own negligence. Under these circumstances, it cannot be said that the trial court abused its discretion in refusing to set aside the default judgment. Cf. Simpson v. Glenn, 103 S.W.2d 433 (Tex.Civ. App., 1937, no writ); Griffin v. Duty, 286 S.W.2d 229 (Tex.Civ.App., 1956, no writ).

c. *Liability of National for Attorney's Fees*

■ Despite some uncertainty in the decisions by our intermediate appellate courts, it is now settled that a surety on an Article 5160 payment bond is not liable for attorney's fees. New Amsterdam Casualty Co. v. Texas Industries, Inc., Tex., 414 S.W.2d 914 (April 29, 1967). Eureka's petition, then, failed to state a cause of action against National for attorney's fees, and it was error to allow recovery therefor.

## 2. THE SAMSCO CLAIM

Appellants' assault on the judgment in favor of SAMSCO is based on the following contentions: (a) The notice of claim given by SAMSCO on October 27, 1964, was not sufficient to perfect a claim under Article 5160 because, at the time such notice was given, SAMSCO had assigned its claim against Graham and, in any event, under the provisions of the statute, such notice could not operate to perfect a claim based on materials furnished or labor performed prior to July 1, 1964. (b) The trial court erred in failing to apply payments made by Graham to SAMSCO to that portion of SAMSCO's claim based on materials furnished and labor done after July 1, 1964. (c) The trial court erred in rendering judgment in favor of SAMSCO on that portion of the claim based on an open account, since there was insufficient evidence of the market value of the materials furnished. (d) The trial court erred in not permitting National to set off, as against SAMSCO's claim, the full amount of the jugment recovered by Eureka against National, and in not allowing Graham to set off, as against SAMSCO, the sum of $9,-203.43, the amount of the judgment rendered in favor of Eureka against National, the surety. (e) The trial court erred in finding that SAMSCO did not materially delay the completion of the contract between Graham and the Alice Water Authority.

### a. *Notice*

■ The written notice of SAMSCO's claim was received by Graham and National on October 27, 1964. It is undisputed that, prior to that date, SAMSCO had assigned all of its accounts receivable, including its claim against Graham, to Mill Factors Corporation as security for money advanced by Mill to SAMSCO. In this connection, appellants also complain of the failure of the trial court to grant their request, timely made, to make an additional finding of fact to the effect that, at the time SAMSCO gave notice of its claim against Graham, SAMSCO was not the owner of the claim.

The instrument by which SAMSCO's accounts receivable were assigned to Mill was not offered in evidence. The undisputed evidence shows that the assignment was only for the purpose of collateral security, with SAMSCO retaining the right to manage and control the accounts, and to attempt collection thereof, until some time in December, 1964, or January, 1965, at which time Mill exercised its option to assume control of the accounts. In March, 1965,

SAMSCO and Mill entered into a written agreement to act jointly in the collection of the accounts, and, subsequently, in consideration of payment by SAMSCO of Mill's claim, Mill reassigned the accounts receivable to SAMSCO.

■ In the absence of the instrument of assignment, and in view of the testimony concerning the nature of such assignment and the rights of the parties thereunder, the trial court did not err in refusing to find that SAMSCO was not entitled, on October 27, 1964, the date of the notice, to take all steps necessary for the collection of the debt owed by Graham. In any event, the rule seems to be that notice given by an assignor, after assignment, is sufficient compliance with the requirement of notice involving bonds of contractors. 10 Appleman, Insurance Law and Practice, § 6260 (1943). This rule would appear to be peculiarly applicable where, as here, the assignment was for the purpose of collateral security only, and the notice was given by the assignor at a time when he retained the right to control the accounts and to attempt the collection thereof. We conclude that the record before this Court affirmatively shows that the refusal of the trial court to make the requested supplemental findings resulted in no injury to appellants. 4 McDonald, Texas Civil Practice, § 16.08, p. 1298 (1950).

■ Next, it is insisted that, in any event under the provisions of Article 5160, the notice given by SAMSCO on October 27, 1964, could be effective to perfect a claim only for materials delivered and labor done after June 30, 1964. The judgment below allows SAMSCO recovery for all materials delivered and labor done by SAMSCO during the period beginning on or about April 25, 1964, and ending October 26, 1964. Of SAMSCO's total claim of $62,081.67, only $36,328.02 represents materials delivered or labor performed after June 30, 1964.

The written notice shows on its face that SAMSCO was demanding payment for all materials furnished and labor performed by it during the entire six-month period beginning April 25, 1964, and that its claim was not limited to transactions occurring after June 30, 1964. Therefore, when the notice was received by National, it was clear that, under the provisions of Article 5160, National had a defense to that portion of the claim based on transactions which took place prior to July 1, 1964.[1] The evidence shows that, upon receipt of the notice, Mr. Carruth, National's attorney assured SAMSCO that National had "a solvent indemnitor," that SAMSCO's claim "would be taken care of," that there was no need to worry, and that National would "look into it." When, on November 9, 1964, Graham filed his interpleader action, SAMSCO's attorney telephoned the attorney for National to ascertain what was "going on." The attorney for National replied that he did not know.

Conversations and discussions between the two attorneys continued, and by July 1, 1965, they had agreed on a settlement in the neighborhood of $55,000.00–$57,000.00, subject to the approval of Graham's attorney. Later in that month, SAMSCO received a copy of a letter written to National by Graham's attorney protesting any settlement between National and SAMSCO. No question concerning the timeliness of the notice to perfect a claim based on the transactions occurring before July 1, 1964, was raised by National during all of this time. It was not until National filed its answer in this suit on August 26, 1965, almost ten months after receipt of the notice, that National raised the question of timeliness of the notice.

1. Par. B(a) of Article 5160 requires that a claimant in the position of SAMSCO shall give, within 90 days after the 10th day of the month next following each month in which the labor was done or materials delivered, written notice of the claim by certified or registered mail, addressed to the prime contractor and to the surety.

On the basis of the evidence outlined above, the trial court found that National had waived its right to insist that the notice given on October 27, 1964, was insufficient to perfect a claim based on transactions occurring prior to July 1, 1964.

Our Courts have held that compliance with the notice provisions of Article 5160 may be waived. General Ins. Co. of America v. Smith & Wardroup, Inc., 388 S.W.2d 262 (Tex.Civ.App., 1965, writ ref'd n. r. e.). However, National insists that there can be no finding of waiver of the notice requirement in this case because all of the conduct relied on by SAMSCO as establishing a waiver took place after the time had expired for the giving of notice relating to the transactions prior to July 1, 1964. An examination of the doctrine of waiver, as distinguished from the doctrine of estoppel, reveals that this contention is without merit.

Where an obligor "waives" performance of a condition precedent to his duty to perform, the waiver is the result of his own voluntary conduct and is legally effective even though the obligee, or the person to whom performance is due, has given no consideration for it and has not changed his position in reliance on the obligor's course of conduct. Equitable Life Assur. Soc. v. Ellis, 105 Tex. 526, 147 S.W. 1152, 1157, 152 S.W. 625 (1913). Where the conduct of the obligor which eliminates the condition precedent causes the other party to change his position materially in reliance on such conduct, the obligor is said to be "estopped" to assert as a defense the nonoccurrence of the event or condition on which his duty to perform was dependent. But, even in such cases, the obligor's conduct can still be described as a waiver, while the resulting action of the other party justifies the added description of estoppel. That is, waiver depends solely on what the obligor does; estoppel depends on what he has caused his adversary to do.

If, while performance of the condition it still possible, the obligor signifies his intention not to insist on the performance of such condition, there would normally exist all of the elements of an estoppel, since in almost every such case the obligee, if he failed to perform the condition, could show that his failure was the result of reliance on the obligor's conduct. On the other hand, if the conduct of the obligor which results in the elimination of the condition takes place after performance of such condition has become impossible, then, in the usual case, there can be no estoppel, since the obligee cannot show that his failure to perform resulted from reliance on the conduct of the obligor. In such cases, the elimination of the requirement of the existence or occurrence of the condition must rest solely on the doctrine of waiver, rather than on any theory of estoppel.

It is apparent, then, that a rule limiting the application of the doctrine of waiver to situations where the asserted waiver takes place before expiration of the time for performance of the condition would substantially destroy the distinction between waiver and estoppel since, as pointed out above, in almost all such situations all elements of estoppel are present.

There is ample authority to support the rule that a waiver may be effective after expiration of the time for performance of a condition has expired, if the condition which is asserted to have been waived is not a material part of the agreed equivalent of the obligor's promise and its nonperformance does not materially affect the value received by the obligor. Restatement, Contracts, §§ 88(1), 297 (1932); 3A Corbin, Contracts, § 759 (1960); 14 Couch, Insurance § 49.784 (2d ed., 1965). Our Supreme Court has recognized that waiver of a condition precedent to liability may be established by conduct occurring after the time for performance or occurrence of the condition has expired. Equitable Life Assur. Soc. v. Ellis, supra.

The rule that the requirement of timely notice may be waived after expiration of the time during which such notice may be

given finds support in cases involving the liability of an endorser of a negotiable instrument. In this connection, it should be noted that the position of an endorser of a note is closely analogous to that of a surety on a contractor's bond. Cushman, Surety Bonds on Public and Private Construction Contracts, 46 A.B.A.J. 649, 652 (1960). Even before the adoption of the Negotiable Instruments Act in Texas, our Courts had held, with reference to the rule requiring notice of dishonor to an endorser, that the endorser could waive the requirement of such notice and thereby become bound on the instrument, even though the time for giving such notice had expired and, therefore, the endorser had been discharged of liability. Stone v. Smith, 30 Tex. 138, 139 (1867); First Nat. Bank v. Bonner, 27 S.W. 698 (Tex.Civ.App., 1894, writ dism'd).

▮▮▮▮▮ Appellants next assert that there is no competent evidence to support the finding of a waiver in this case, because all of the evidence on which a waiver might be based consists of settlement negotiations between SAMSCO and National, and such evidence should have been excluded when objected to by National. It is true that evidence of offers to settle or compromise is excluded as irrelevant to the issue of the validity of the claim with reference to which such offers are made, but it is well settled that evidence of extensive negotiations entered into by the obligor looking toward settlement of a claim is admissible and can support a finding of waiver of the right to object to a failure to give notice of claim within the time required. Alamo Casualty Co. v. Trafton, 231 S.W.2d 474 (Tex.Civ.App., 1950, writ dism'd); Service Mut. Ins. Co. of Texas v. Territo, 147 S.W.2d 846 (Tex.Civ.App., 1941, no writ); Commercial Union Assur. Co. v. Meyer, 9 Tex.Civ.App. 7, 29 S.W. 93 (1894, no writ); Concordia Ins. Co. of Milwaukee v. School Dist., 40 F.2d 379 (10th Cir., 1930, aff'd, 282 U.S. 545, 51 S.Ct. 275, 75 L.Ed. 528); 14 Couch, op. cit., § 49.898. The trial court's finding of waiver is supported by the evidence.

b. *Application of Payments Made by Graham*

▮▮▮ In addition to materials furnished and labor done by SAMSCO in connection with the $64,000.00 lump sum contract for installation of the two water tanks, SAMSCO, from time to time, delivered on open account, materials which were used by Graham in performance of his contract with the Alice Water Authority. National contends that payments made by Graham between July 1, 1964, and October 26, 1964, were improperly applied by SAMSCO to satisfaction of the balance owing on the open account, rather than in payment of the amount owing on the $64,000.00 contract. It is also argued that such payments should have been applied as payments for materials furnished and labor done by SAMSCO during the period after June 30, 1964, thus, discharging that portion of Graham's indebtedness for which National was liable.

The evidence establishes that all materials furnished by SAMSCO under the open account were used by Graham in the construction of the Alice Water project. Therefore, National, as surety for Graham, was liable for all such materials. In view of our holding that, under the doctrine of waiver, National was liable for all materials delivered and labor done by SAMSCO in connection with the Alice project, the manner in which SAMSCO applied the payments made by Graham becomes immaterial. Irrespective of the items of indebtedness to which such payments were applied, they were applied to reduce the entire debt for which Graham and National were liable.

c. *Sufficiency of Evidence of Market Value*

▮▮▮ Appellants urge that the trial court erred in entering judgment in favor of SAMSCO for the materials sold to Graham on open account because there is insufficient evidence to establish the reasonable market value of such materials. There is in evidence a letter from SAMSCO to Graham, dated November 18, 1963, before any such

materials were delivered, outlining the manner in which the open account purchases were to be handled. This letter states that the prices which would be charged for such materials would be in accordance with quotations furnished Graham by SAMSCO on October 26, 1963. At the request of SAMSCO, Graham's purchasing agent signed this letter as a manifestation of agreement with the plan outlined therein and returned the letter to SAMSCO. It thus appears that the materials furnished were sold and delivered at prices previously agreed upon between the parties. Therefore, evidence of the reasonable market value of such materials was not required.

■ Further, the evidence shows that, over a period of several months, invoices describing the materials shipped and the quantity and prices thereof were sent to Graham simultaneously with the shipment covered by such invoices. At no time did Graham object to the prices listed in such invoices. Graham's failure to object permits the inference of his approval of the prices so as to establish a stated account, eliminating the requirement of evidence of market value. Davis v. Gilmore, 244 S.W. 2d 671 (Tex.Civ.App., 1951, writ ref'd).

### d. *The Question of Set-Off*

The evidence showed that Eureka gave its notice of claim on October 24, 1964. Under the provisions of Article 5160, such notice was operative to perfect Eureka's claim against the payment bond only for materials furnished by it to SAMSCO after September 1, 1964.[2] The evidence showed that the materials furnished by Eureka after September 1, 1964, had a value of $4,650.00. As already pointed out, the judgment below allowed National credit for this amount.

National contends that since Eureka recovered a default judgment against National in the sum of $9,203.43, being the value of all materials furnished by Eureka to SAMSCO, the trial court should have allowed National a set-off, as against SAMSCO, of $9,203.43. It is also insisted that Graham was entitled to set off, as against SAMSCO, the amount Eureka recovered from National, Graham's surety.

■ The arguments urged in support of the right to offset are based on the theory that, as to the amount owed Eureka by SAMSCO, National is in the position of a surety. However, no part of Eureka's claim has been paid by National. An unconditional judgment cannot be rendered in favor of the surety against the principal at the same time judgment is rendered against the principal and the surety for the sum adjudged against the principal and surety. The surety is entitled to recover of the principal only such sum as he may be compelled to pay on the judgment rendered against them. Labbe v. Corbett, 69 Tex. 503, 6 S.W. 808 (1888); Abney v. Citizens' Nat. Bank, 152 S.W. 734 (Tex.Civ.App., no writ). The right of the surety to recover from the principal does not arise until the surety has discharged all or a portion of the principal's obligation.

■ If, then, until the surety has paid all or part of the principal's obligation, he is not entitled to judgment over against the principal, it follows that National is not entitled to set off the full amount of the judgment rendered in favor of Eureka against SAMSCO and National. On the other hand, it would be manifestly unjust in this case to allow SAMSCO to recover the full amount of the debt owed by Graham and National without making provision in the judgment for protection of National in the event that it discharges SAMSCO's obligation to Eureka. We believe that in this case the judgment of the trial

---

**2.** Par. B(b) (2) of Article 5160 requires that a claimant who, like Eureka, had no contractual relationship with the prime contractor, shall give written notice by certified or registered mail to the prime contractor within 36 days after the 10th day of the month next following each month in which the materials were delivered or labor performed.

court should be reformed to provide that National and Graham are entitled to set off, as against the judgment rendered against them in favor of SAMSCO, whatever portion of the Eureka claim is discharged by National. Only in this way can we insure that SAMSCO will not be unjustly enriched in the sum of $9,203.43 should National satisfy the judgment rendered in favor of Eureka against SAMSCO and National. At the same time, this will make certain that National and Graham will receive credit only to the extent that National discharges SAMSCO's obligation to Eureka.

■ SAMSCO insists that, since the evidence disclosed that National had a defense to all of Eureka's claim, with the exception of the amount of $4,650.00, the trial court correctly limited the allowable set-off to that amount, since SAMSCO should not be penalized for National's failure to properly defend Eureka's suit. However, this argument ignores the fact that, should National discharge SAMSCO's entire obligation to Eureka, limiting National's right of offset to $4,650.00 would result in a double recovery by SAMSCO. It also overlooks the rule that a surety, in order to be entitled to reimbursement from his principal, is not compelled to take advantage of every technical objection to the claim of the creditor. The defense which National might have successfully interposed to a portion of Eureka's claim was the failure of Eureka to give timely notice relating to transactions occurring prior to September 1, 1964. This defense was personal to National and could be waived by it without affecting its right to reimbursement from SAMSCO. 72 C.J.S. Principal and Surety § 309 (4), p. 771.

■

### e. *SAMSCO's Responsibility for Delay in Completion of Project*

■ The trial court found that SAMSCO did not materially delay the completion by Graham of his contract with the Alice Water Authority. It is undisputed that the project was not completed on schedule by Graham and that, as a result of the delay, Graham was forced to pay the Alice Water Authority more than $20,000.00 as liquidated damages. The evidence concerning the reason for the numerous delays is conflicting and, considering the record as a whole, it cannot be said that the finding of the trial court is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

The judgment of the trial court is reformed by deleting therefrom that portion which allows Eureka Machine Tools, Inc., to recover from National Surety Corporation the sum of $500.00 for attorney's fees, and by including therein a provision to the effect that appellants, H. Gillis Graham, d/b/a Graham Construction Company, and National Surety Corporation shall be allowed credit, as against the judgment rendered in favor of San Antonio Machine and Supply Corporation against them, for such sums as may be paid by National Surety Corporation in satisfaction of the judgment rendered in favor of Eureka Machine Tools, Inc., against San Antonio Machine and Supply Corporation and National Surety Corporation.

As so reformed, the judgment of the trial court is affirmed.

KLINGEMAN, J., did not participate in the decision of this case.