Harold B. SCHWARTZ,
Plaintiff-Appellee,

v.

NMS INDUSTRIES, INC.,
Defendant-Appellant,

v.

Erich ROSENBAUM,
Plaintiff-Intervenor-Appellee.

No. 74–3275.

United States Court of Appeals,
Fifth Circuit.

Aug. 18, 1975.

Rehearing Denied Sept. 12, 1975.

Logan Ford, Dallas, Tex., for defendant-appellant.

Larry B. Bach, Dallas, Tex., for H. B. Schwartz.

Stanley M. Kaufman, Dallas, Tex., for E. Rosenbaum.

Before BROWN, Chief Judge, and GEWIN and THORNBERRY, Circuit Judges.

THORNBERRY, Circuit Judge:

Resolution of this contractual dispute depends upon the proper interpretation under Texas law of the conduct of the parties after execution of a registration agreement in connection with a corporate acquisition. The district court determined that the acquiring company, NMS Industries, Inc., had breached its contractual obligation to the two shareholders of the acquired company, making it liable for substantial damages. NMS now challenges that judgment here. While we affirm the district court's decision on the liability issue, we remand for further findings of fact and conclusions of law on the damages question.

Harold Schwartz and Erich Rosenbaum, the appellees, owned all of the stock of Star Ribbons, Inc., a Texas corporation. NMS Industries, Inc. acquired Star Ribbons through an exchange of stock. In connection with the acquisition agreement,[1] Schwartz and Rosenbaum executed a registration agreement with NMS on December 19, 1969. That agreement contained the following provision relative to registration of the NMS shares Schwartz and Rosenbaum would receive in exchange for their Star Ribbons stock.

4.(a) NMS agrees that if, in the opinion of its counsel, or Shareholder's aforesaid counsel, any offer, sale or other disposition by a Shareholder of any Shares will require (i) the registration of such Shares under the Act, or (ii) the delivery of a prospectus which complies with Section 10 of the Act, upon receipt at any time within

1. Schwartz, Rosenbaum, NMS Industries and Star Ribbons, Inc. executed an acquisition agreement on September 17, 1969. Under the terms of that document, NMS agreed to purchase all of Star Ribbons' outstanding stock for 85,000 shares of NMS common stock. The parties amended the agreement on December 12, 1969 to provide that NMS would deliver 70,000 shares of its common stock at the initial closing and up to 15,000 shares at a supplemental closing. The modification reflected a downward revision in the estimated net income and equity of Star Industries for the year ending September 30, 1969. The parties executed a supplemental modification on February 1, 1971 that obligated NMS to deliver the entire 15,000 supplemental shares.

the three (3) year period commencing with the Delivery Date specified in said Agreement, of a written demand from Shareholders who then hold at least 50% of the NMS Common Stock received under the Agreement, it will cause a registration statement with respect to the Shares which Shareholders propose to sell or otherwise dispose of to be filed under the Act. If aforesaid counsel for NMS or any Shareholder is of the opinion that any offer, sale or disposition contemplated by such Shareholder will not require the registration of such Shares under the Act, such counsel shall render such opinion to NMS and such Shareholder and to any broker or dealer acting on his behalf in connection with such offer, sale or disposition. Each Shareholder agrees not to offer more than 25% of his Shares received under the Agreement for such registration during the one (1) year after Delivery Date, nor more than 50% of such Shares for registration during the first two (2) years after such Delivery Date.

. . . . .

It is understood and agreed that NMS shall be required to file only one such Registration Statement pursuant to Section 4(a) hereof.

Pursuant to the agreement for NMS's acquisition of Star Ribbons, Inc., Schwartz and Rosenbaum each received a total of 40,375 shares of unregistered NMS common stock.[2] For purposes of the registration provision above, the delivery date of those shares was May 1, 1970.[3]

Shortly before the Star Ribbons acquisition, NMS acquired Inland Dynatronics Company by a similar exchange of stock. In early 1970, NMS began to prepare a registration statement in connection with the NMS common stock held by the Inland Dynatronics principals. It offered to allow Schwartz and Rosenbaum to include their stock in this registration. The two orally accepted that offer, but in a letter written in July 1970, they stated that they did not wish to include their shares in that registration. NMS proceeded to file the Inland Dynatronics registration without including the Schwartz-Rosenbaum shares, and the statement became effective August 19, 1971. On August 30, 1971, Schwartz and Rosenbaum made a written demand that NMS register 50% of their shares. The pair then sent another letter dated September 9, 1971 demanding that NMS register all of their shares. NMS refused to honor either demand, and eventually this lawsuit arose.

The district court correctly found that the August 30, 1971 letter demanding registration of 50% of the stock held by Schwartz and Rosenbaum conformed to the terms of Section 4.(a) of the registration agreement. That demand was in writing, made by shareholders holding at least 50% of the NMS stock received under the NMS-Star Ribbons acquisition agreement, and requested registration of the maximum amount of stock permissible at that time under the agreement. NMS admittedly failed to file a registration statement covering the stock within 120 days after the demand. And it

**2.** David R. Barnes received a total of 4,250 shares of NMS Industries common stock for his role in the acquisition. NMS subsequently registered Barnes' shares and he is not involved in these proceedings.

**3.** Section 1.8 of the first modification of the acquisition agreement provided:

If at initial closing listing approval has not been obtained, and the NMS shares issued, then within ten (10) days after listing approval, on at least three (3) business days prior notice to the Escrowees and Shareholders, (the Delivery Date) the NMS shares

shall be delivered to the Shareholders at the offices of Star aforesaid, same time.

Listing approval had not been obtained by the time of the initial closing. The American Stock Exchange began to list NMS stock in April 1970, and the escrowees delivered the NMS shares to Schwartz and Rosenbaum on May 1, 1970. The court below properly found the delivery date in Section 4.(a) of the registration agreement was May 1, 1970. Conclusion of Law 4. Though Schwartz and Rosenbaum received an additional 7,125 shares in 1971, for purposes of the registration agreement the delivery date for all shares was May 1, 1970.

failed to use its best efforts to make the registration statement filed effective as soon as practicable as required by Section 4.(b)(ii) of the registration agreement.[4] Thus NMS is clearly liable to Schwartz and Rosenbaum for its breach of the registration agreement unless some conduct on their part before or after the August 30, 1971 demand excused NMS from performance of its obligation to register the stock.

NMS first contends that when Schwartz and Rosenbaum orally agreed to have their stock registered with the Inland Dynatronics registration statement, they modified the terms of the original registration agreement. Then NMS contends that the subsequent withdrawal from the Inland Dynatronics registration waived any right to a cost-free registration, discharging NMS. It is clear that under Texas law, the parties to a written agreement may subsequently make oral modifications to that agreement. University State Bank v. Gifford-Hill Concrete Corp., 431 S.W.2d 561 (Tex. Civ.App.—Ft. Worth 1968, writ ref'd n. r. e.). But the oral acceptance here did not create any new agreement. NMS only offered to perform its original contractual duty to provide one cost-free registration.[5] Nothing in the original registration agreement compelled Schwartz and Rosenbaum to avail themselves of any particular opportunity to register their shares in the three year time period. After the oral acceptance, NMS began to perform its obligations under the original registration agreement.

We agree with the trial court that Schwartz and Rosenbaum did not waive their right to a cost-free registration by withdrawing their acceptance in July 1970. Waiver denotes the intentional relinquishment of a known right or conduct inconsistent with claiming it. United States Fid. & Guar. Co. v. Bimco Iron & Metal Corp., 464 S.W.2d 353 (Tex. 1971); Massachusetts Bond. & Ins. Co. v. Orkin Exterminating Co., 416 S.W.2d 396 (Tex.1967). At no time did either Schwartz or Rosenbaum indicate their intention to relinquish their right to one cost-free registration. Their oral acceptance of the offer to be included in the Inland Dynatronics registration indicated an intention to exercise their contractual right at that time. But when NMS acquiesced in the withdrawal of the oral acceptance, the parties returned to their original posture under the registration agreement. When NMS failed to protest the withdrawal Schwartz and Rosenbaum reasonably presumed they still had a right to one cost-free registration under the original registration agreement.

NMS claims that the oral acceptance estops Schwartz and Rosenbaum from subsequently demanding registration of their shares. The essential elements of estoppel are established by showing that the conduct of one party has induced the other party to change his position in reliance on the conduct, and that to allow the first party to later

---

**4.** Section 4.(b)(ii) of the registration agreement required NMS to:

> file within 120 days after the demand, and use its best efforts to make effective at the earliest practicable date consistent with the procedures then followed by the Securities and Exchange Commission, a registration statement under the Act (the "Registration Statement") with respect to the Shares covered by the demand and/or such sales or dispositions thereof, and advise the Shareholders when the Registration Statement has become effective. . . .

**5.** Since NMS was only offering to fulfill its original contractual obligation, there was also no consideration for the "new agreement." Under Texas law, a novation is unenforceable without consideration. Pasadena Police Officers Ass'n v. City of Pasadena, 497 S.W.2d 388 (Tex.Civ.App.—Houston [1st Dist.] 1973, no writ); University State Bank v. Gifford-Hill Con. Corp., 431 S.W.2d 561 (Tex.Civ.App.—Ft. Worth 1968, writ ref'd n. r. e.). NMS recognizes the existence of the consideration requirement, but contends it is satisfied here by the promise to include the stock in a particular registration statement. Brief for Appellants at 15. That argument is fallacious. Schwartz and Rosenbaum were not receiving anything more than they were originally entitled to— one cost-free registration statement.

disavow that conduct would cause substantial hardship to the second party. Massachusetts Bond. & Ins. Co. v. Orkin Exterm. Co., 416 S.W.2d 396 (Tex.1967); Graham v. San Antonio Mach. & Supp. Corp., 418 S.W.2d 303 (Tex.Civ.App.— San Antonio 1967, writ ref'd n. r. e.). Clearly NMS began to act upon the oral acceptance that Schwartz and Rosenbaum gave. But the other essential element of estoppel is not present here. The advantage to NMS of "piggy-backing" the Schwartz-Rosenbaum shares with the shares of the Inland Dynatronics principals was that it enabled NMS to discharge its obligation to provide a cost-free registration to Schwartz and Rosenbaum at essentially no cost. Since the cost of preparation of a registration statement was approximately $75,000, this was a substantial benefit. NMS lost that potential saving when Schwartz and Rosenbaum refused to be included. But that is not a benefit to which they were contractually entitled under the registration agreement. Thus they suffered no legal detriment when the two subsequently refused to allow NMS to register their shares. NMS did not show that they incurred any additional costs in preparing Inland Dynatronics registration statement as a result of the oral acceptance.

■ NMS might have been justified in including the Schwartz-Rosenbaum shares in the Inland Dynatronics registration statement. Though entitled under the registration agreement to a written demand for registration, NMS's conduct in proceeding to include the shares in the statement could have been interpreted as a waiver of the written demand requirement. See United States Fid. & Guar. Co. v. Bimco Iron & Metal Corp., 464 S.W.2d 353 (Tex.1971); Massachusetts Bond. & Ins. Co. v. Orkin Exterminating Co., 416 S.W.2d 396 (Tex.1967); Equitable Life Assur. Soc. v. Ellis, 105 Tex. 526, 147 S.W. 1152 (1913). Then NMS might have justifiably refused to give effect to the July 1970 letter refusing to participate in the Inland Dynatronics registration arguing that the

waiver of written demand had created an enforceable duty on the part of NMS to register the shares. Actual performance of its registration obligation would have discharged NMS's duties under Section 4.(a) of the registration agreement. See 5A Corbin on Contracts Section 1233. Instead NMS gave effect to the July 1970 withdrawal, leaving the parties in the same position as if the acceptance had never been given. The mere fact that it was willing to include the Schwartz-Rosenbaum shares in the Inland Dynatronics registration statement is not sufficient to discharge the contractual obligation. Id.

■ We also reject NMS's strained argument that the September 9, 1971 letter requesting registration of all the shares discharged its obligation to register any. The August 30, 1971 request conformed to the terms of the original registration agreement. At the time that demand was made, those original terms were still in effect. Thus the demand created an enforceable obligation on the part of NMS to register 50% of the shares. The subsequent request to register all the shares could not discharge the obligation. It represents a mere request that NMS go beyond its contractual obligations, and do Schwartz and Rosenbaum the service of registering the other 50% of their NMS holdings. Though under no obligation to accede to this request, neither could NMS seize upon it to get out of a distasteful contractual commitment.

■ Even more strained is NMS's argument that the July 21, 1972 letter from David Fisher, counsel for NMS, regarding removal of the restrictive legend on Schwartz's stock discharged NMS's obligations under the registration agreement. Section 4.(a) of the registration agreement provided in part:

If aforesaid counsel for NMS or any Shareholder is of the opinion that any offer, sale or disposition contemplated by such Shareholder will not require the registration of such Shares under the Act, such counsel shall render such

opinion to NMS and such Shareholder and to any broker or dealer acting on his behalf in connection with such offer, sale or disposition.

But this provision must be read in context to determine the intention of the parties. We think the clear import of Section 4.(a) is to require NMS, after receipt of a valid demand, to either proceed to register the stock or to furnish an opinion from its counsel within a reasonable time that registration was unnecessary. Under Section 4.(b)(ii) NMS had 120 days after demand to file the registration statement. It seems reasonable to require it to furnish the opinion within that time as well. Certainly the opinion rendered almost one year after demand does not constitute performance sufficient to discharge NMS's registration obligations.

We therefore affirm the trial judge's determination that the original registration agreement was in effect on August 30, 1971. The written demand of Schwartz and Rosenbaum satisfied the terms of the agreement, and created an enforceable obligation on NMS to register 50% of the NMS shares they held. Neither the subsequent request nor the rendering of the opinion that registration was unnecessary discharged NMS's obligations under Section 4.(a). Therefore, the trial court correctly held NMS liable for the consequences of their breach of the registration agreement.

When NMS refused to register the Schwartz-Rosenbaum stock, it effectively prevented them from selling it. The trial court treated this as a rather technical conversion of the unregistered stock, and assessed damages as the market value of NMS stock at the time Schwartz and Rosenbaum should have been able to sell it. To determine that value, the court averaged the closing price per share for NMS stock from April 15, 1972 through April 30, 1972 and multiplied that figure by the total number of shares Schwartz and Rosenbaum held. Thus the judge awarded Schwartz and Rosenbaum a total of $83,778.18 plus interest from April 23, 1972.

■ We find that the trial judge was essentially correct in his analysis. Once Schwartz and Rosenbaum made a valid demand for registration they performed the condition precedent under the registration agreement, and gained the right to hold marketable stock. NMS's breach of its obligations deprived Schwartz and Rosenbaum of this right. By maintaining the restrictive legend on the shares, NMS prevented Schwartz and Rosenbaum from selling the stock, and, in effect, converted the shares. See B & H Warehouse, Inc. v. Atlas Van Lines, Inc., 490 F.2d 818 (5 Cir. 1974); Sandor Petroleum Corp. v. Williams, 321 S.W.2d 614 (Tex.Civ.App.—Eastland 1959, writ ref'd n. r. e.). Thus the district judge properly measured the damages as the value of the marketable NMS common stock on the date Schwartz and Rosenbaum could reasonably have expected to sell it— April 23, 1972.

However, the trial judge failed to reduce the award by the value of the stock Schwartz and Rosenbaum could have sold despite NMS's default. On April 15, 1972, the Securities and Exchange Commission (SEC) put Rule 144 into effect. Under the provisions of that rule, restricted stock held for over two years may be sold subject to certain conditions. The trial judge specifically concluded that after the effective date of Rule 144, both Schwartz and Rosenbaum could have sold some of their restricted stock despite NMS's refusal to register it. Conclusion of Law 11. Since the "conversion" of the stock results from the inability to market it, Schwartz and Rosenbaum had a duty to mitigate their damages by selling the maximum amount of stock allowable under Rule 144. LTV Corp. v. Bateman, 492 S.W.2d 703 (Tex.Civ.App.—Tyler 1973, writ ref'd n. r. e.); Birge v. Toppers Menswear Inc., 473 S.W.2d 79 (Tex.Civ.App.—Dallas 1971, writ ref'd n. r. e.). Accordingly their recovery should be reduced by the market value of the amount of stock they could have sold pursuant to Rule 144. We remand the case to the trial

judge for further findings and conclusions on that point.

Affirmed in part, reversed in part and remanded.