**PENNZOIL COMPANY, et al., Petitioners**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 84–4296.

United States Court of Appeals, Fifth Circuit.

May 14, 1986.

Joel M. Cockrell (argued), Andrea Wolfman, Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., for F.E.R.C.

Charles M. Darling, IV (argued), Stephen L. Teichler, Washington, D.C., John Chapman, Houston, Tex., for Pennzoil Oil Co.

Thomas G. Johnson, Shell Oil Co., Houston, Tex., Robert A. Hasty, Jr., for Shell Oil Co.

Jon L. Brunenkant, Washington, D.C., for Hunt Oil Co.

Baker & Botts, Houston, Tex., Cecil W. Talley, Stephen M. Hackerman, for United Gas Pipe Line Co.

Hargrove, Guyton, Ramey & Barlow, Shreveport, La., Thomas J. Wyatt, for Norton Oil Co., Huggs, Inc., Par Oil Corp.

Sherman S. Poland, Washington, D.C., for Logue and Patterson Inc.

Grant & Dean, Walter C. Dunn, Jr., Monroe, La., for Sho-Van Gas Producing Co., Inc., Primos.

Baker & Botts, Stephen L. Teichler, Washington, D.C., for Tenneco Oil Co., Et Al.

Gail S. Gilman (argued) Sutherland, Asbill & Brennan, Washington, D.C., for M.D. Abel Co.

Minard & Mixon, Columbia, La., James E. Mixon, for John H. McCarter, Jr.

Allan W. Anderson, Jr., Washington, D.C., for The Maurice L. Brown Co.

J. Paul Douglas (argued), Michael Maloney, Arco Oil & Gas Co., Dallas, Tex., Grove, Jaskiewicz, Gilliam & Cobert, Washington, D.C., for Arco Oil & Gas Co.

Edmunds Travis, Jr., Exxon Corp., Houston, Tex., Douglas W. Rasch, for Exxon Corp.

Grove, Jaskiewicz, Gilliam, Washington, D.C., Steven R. Severy, Marathon Oil Co., Findlay, Ohio, for Marathon Oil.

Ronald D. Hurst, Paul W. Hicks, Dallas, Tex., for Placid Oil Co.

Craig W. Hulvey, Washington, D.C., for Relco Exploration Co. and The Harold L. Woods Group.

Gail S. Gilman, Washington, D.C., Paul W. Fox., for Clemco, Inc. and Tyler Oil and Gas, Inc.

Albert Sylvia, III, Lois Ellen Gold, Los Angeles, Ca., for Union Oil of California.

Carmen Chidester Farrell, Tulsa, Okl., for Cities Service Oil and Gas Corp.

Anthony V. Sorrentino, Houston, Tex., David R. Stevenson, for Gulf Oil Corp.

Jennifer A. Cates, C.J. Roberts, Larry Pain, Bartlesville, Okl., for Phillips Petroleum Co.

Robert D. Haworth, Edgar K. Parks, Houston, Tex., for Mobil Oil Corp.

Karen A. Berndt, Merrill E. Fliederbaum, Houston, Tex., for Texaco, Inc.

Lawrence E. Glenn, Houston, Tex., for Robert W. Anderson.

Thomas H. Burton, Carolyn S. Hazel, Houston, Tex., for Conoco, Inc.

Before Clark, Chief Judge, and BROWN and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Certain natural gas producers and other intervenors in this action [1] (hereinafter "the producers") seek review of two orders [2] of the Federal Energy Regulatory Commission ("the Commission") [3] which involve a case specific application of third-party protest procedures adopted by the Commission in the "Order 23 Series" [4] and affirmed in part and modified in part by this Court in *Pennzoil Co. v. FERC*, 645 F.2d 360 (5th Cir.1981), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982) (hereinafter referred to as *"Pennzoil"*). The central issues in this appeal focus on whether the Commission's decision, which sustained third-party protests to certain producer-sellers' contractual authorization to collect the stripper well price established under section 108 of the Natural Gas Policy Act of 1978, 15 U.S.C. § 3318, properly applies this Court's decision in *Pennzoil*, and whether it is supported by substantial evidence. Finding that the Commission has

---

**1.** Petitioners and intervenors include: Pennzoil Co.; M.D. Abel Co.; Amoco Production Co.; Robert W. Anderson; ARCO Oil and Gas Co., a division of Atlantic Richfield Co.; The Maurice L. Brown Co.; Cities Service Oil & Gas Corp.; Clemco, Inc.; Tyler Oil and Gas, Inc.; CONOCO Inc.; Exxon Corp.; Gulf Oil Corp.; Huggs Inc.; Hunt Oil Co.; Logue and Patterson, Inc.; Marathon Oil Co.; Mobil Oil Corp.; Mobil Oil Exploration and Producing Southeast, Inc.; Mobil Producing Texas and New Mexico, Inc.; Norton Oil Co., Inc.; Par Oil Corp.; Phillips Petroleum Co.; Placid Oil Co.; Primos Production; Relco Exploration Co.; The Harold L. Woods group; Shell Offshore Inc.; Shell Western E & P Inc.; Sho-Van Gas Producing Co.; Sun Exploration & Production Co.; Tenneco Oil Co.; Houston Oil & Minerals Corp.; Texaco Inc.; United Gas Pipe Line Co.; and John McCarter.

**2.** Opinion No. 181, United Gas Pipe Line Co., Docket No. GP80-41-000, 24 F.E.R.C. (CCH) ¶ 61,083 (July 19, 1983); Opinion No. 181-A, United Gas Pipe Line Co., Docket Nos. GP80-41-

002, *et al.*, 27 F.E.R.C. (CCH) ¶ 61,199 (May 7, 1984).

**3.** In 1977, the Commission took over the functions and responsibilities of the Federal Power Commission pursuant to the Department of Energy Organization Act § 402(a), 42 U.S.C. § 7172(a), and Exec. Order No. 12009, 42 Fed. Reg. 46,267 (September 15, 1977). References to the Commission prior to October 1, 1977, are to the Federal Power Commission. References subsequent to October 1, 1977, are to the Federal Energy Regulatory Commission.

**4.** Order No. 23, 6 F.E.R.C. (CCH) ¶ 61,229 (March 13, 1979); Order on Rehearing of Order No. 23, 7 F.E.R.C. (CCH) ¶ 61,152 (May 11, 1979); Order No. 23-A, 7 F.E.R.C. (CCH) ¶ 61,247 (June 12, 1979); Order No. 23-B, 7 F.E.R.C. (CCH) ¶ 61,279 (June 21, 1979); Order on Rehearing of Order No. 23-B, 8 F.E.R.C. (CCH) ¶ 61,130 (August 6, 1979); Order on Rehearing of Order No. 23-A, 8 F.E.R.C. (CCH) ¶ 61,158 (August 13, 1979).

fundamentally misconstrued this Court's decision in *Pennzoil*, this Court grants the petitions for review. The agency orders are vacated and the proceedings remanded for reconsideration in light of this opinion.

## I. FACTS AND PROCEDURAL HISTORY

### A. *Background*

As explained in great detail in this Court's opinion in *Pennzoil*, 645 F.2d at 365–71, the adoption of the Natural Gas Policy Act, 15 U.S.C. §§ 3301–3432 ("NGPA"), on November 9, 1978, substantially modified the structure of federal natural gas regulation then existing pursuant to the Natural Gas Act, 15 U.S.C. §§ 717–717w ("NGA"). Prior to the NGPA, the Commission prescribed just and reasonable rates through Commission rate proceedings.[5] The NGPA, in contrast, provided for congressionally set rates promulgated by statute.[6]

Under the *Mobile–Sierra* doctrine,[7] the Supreme Court required that any rate increase filed under section 4 or 5 of the Natural Gas Act must be authorized by the contract between the producer-seller and the pipeline-purchaser. Contractual authority is also a prerequisite to collection of rates established in the NGPA.[8] Over the years, producer-sellers and pipeline-purchasers relied on various indefinite price escalator clauses in their contracts, generically termed area rate clauses,[9] to authorize increases to new rates as such rates were set by the Commission. This Court discussed the historical foundations of area rate clause use in detail in *Pennzoil*, and this Court need not repeat that discussion here. It is sufficient to note that when the Commission abandoned area-based rates and adopted nationwide rates of general applicability, the Commission permitted producers and interstate pipelines to rely on area rate clauses to escalate the contract price to the national ceiling rates.[10]

After enactment of the NGPA, the question arose whether area rate clauses also authorized escalation of rates to those set in the NGPA. The *Pennzoil* case reviewed the Commission's Order 23 series which addressed that issue. In Order 23, the Commission concluded that neither the language of the NGPA nor Commission regulations precluded authorization of NGPA rates through area rate clauses. Nevertheless, the Commission also concluded that it could not dispositively construe all such area rate clauses. Rather, the Commission concluded that it would ascertain and give effect to the contracting parties' intent and that it would not object generally to the parties' reliance on area rate clauses as authority to collect NGPA prices.

Order 23–B established procedures which allowed interstate pipelines and certain

---

5. Initially, the Commission followed an individual cost of service formula for setting rates which the Commission later abandoned for an area by area approach. *See In re Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 317 (1968). Subsequently, the Commission abandoned its area rate approach and adopted nationwide rates of general applicability. *Shell Oil Co. v. FPC*, 520 F.2d 1061 (5th Cir.1975), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976).

6. 15 U.S.C. §§ 3301–3432; *See Public Service Commission v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 103 S.Ct. 3024, 3026, 77 L.Ed.2d 668 (1983).

7. *See United Gas Pipe Line Co. v. Memphis Light, Gas and Water Division*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

8. *Pennzoil*, 645 F.2d at 379.

9. An "area rate clause" is a price escalation provision allowable under 18 C.F.R. § 154.93(b–1). Generally, it authorizes an escalation in the contract price on the occurrence of some specified triggering event, *e.g.*, an increase in the applicable just and reasonable wellhead ceiling price for the category of gas involved. *See Pennzoil*, 645 F.2d at 365 n. 1. Although there are other types of indefinite price escalator clauses, *see Pennzoil*, 645 F.2d at 365–66, this case is concerned only with the type described.

10. *See Pennzoil*, 645 F.2d at 367.

third-party protestors to protest producers' assertion of contractual authority to collect the higher NGPA rates.[11] Of particular importance to this proceeding, Order 23–B and the Order on Rehearing of Order 23–B, adopted a bifurcated procedure for third-party protests. If the contracting parties submit that it was their mutual intent to authorize the NGPA rates, then the Chief ALJ summarily dismisses the third-party protest unless (1) the contractual language is inconsistent with the parties' mutual interpretation, or (2) the protestor submits other specific evidence that explains or modifies the text of the contract. *Pennzoil,* 645 F.2d at 370. If either of these two requirements is met, an evidentiary hearing before another ALJ is scheduled.

As summarized in *Pennzoil,* this procedure creates a rebuttable presumption (hereinafter referred to as "the Order 23 presumption"):

> In other words, the protestor has the burden of coming forward with substantial evidence of the lack of contractual authority to overcome the presumption that the contracting parties' assertion regarding their intent is accurate and not unreasonable. If the protestor meets the burden of production, the contracting parties bear the burden of persuasion at the hearing to show by a preponderance

of the evidence that contractual authority exists. *Id.*[12]

In *Pennzoil,* this Court essentially affirmed the Order 23 procedures. Nevertheless, this Court held that the *Erie* doctrine[13] required the Commission to apply state law principles of contract construction rather than general principles of contract construction developed by the Commission. *Pennzoil,* 645 F.2d at 383–84. The instant case involves petitions for review of a case specific application of these third-party protest procedures.

### B. *The Present Controversy*

On August 27, 1979,[14] United Gas Pipe Line Company ("United") filed an evidentiary submission pursuant to 18 C.F.R. § 154.94(j) which covered 365 natural gas producers and approximately 775 contracts. In this submission, United represented that the contracting parties mutually intended to authorize all NGPA rates through the use of area rate clauses. Third-party protests were filed by the Commission Staff and others.

The Chief ALJ summarily dismissed the majority of the protests on the basis of the Order 23 presumption which attached to the contracting parties' assertion of mutual intent.[15] Nevertheless, the Chief ALJ found that the third-party protestors

---

**11.** As stated in *Pennzoil,* "[t]he protest procedure is limited to gas over which FERC retains some continuing nonprice regulatory control under the NGA. This limits the protest procedure to existing interstate contracts that cover gas entitled to NGPA §§ 104, 106(a), 108, or 109(a)(2) maximum lawful prices." 645 F.2d at 369 (footnote omitted).

**12.** A pipeline protestor, in contrast, does not face the same presumption in order to obtain a hearing. Since there is no agreement concerning intent, the presumption does not arise. Therefore, both the burden of production and the burden of persuasion rest entirely on the producer-seller because the producer-seller is the party seeking the rate increase. *Pennzoil,* 645 F.2d at 370.

**13.** *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**14.** United supplemented this submission on November 11, 1979, December 31, 1979, and July 25, 1980.

**15.** Initial Decision Dismissing in Part Third Party Protests," United Gas Pipe Line Co., Docket No. GP80–41, 12 F.E.R.C. (CCH) ¶ 63,038 (August 28, 1980). The Commission eventually affirmed this summary dismissal. *See* Opinion No. 135, 17 F.E.R.C. (CCH) ¶ 61,232 (1981) (remanding the decision of the Chief ALJ, along with twenty-six other initial decisions, which summarily dismissed protests); Transcontinental Gas Pipe Line Corp., Docket No. GP80–24, 24 F.E.R.C. (CCH) ¶ 63,101 (1983) (reaffirming initial decision on remand); Opinion No. 215, Transcontinental Gas Pipe Line Corp., Docket No. GP80–24, 27 F.E.R.C. (CCH) ¶ 61,180 (1984) (affirming decision of Chief ALJ on remand), *rehearing denied,* Opinion No. 215–A, 28 F.E.R.C. (CCH) ¶ 61,018 (1984), *appeal pending sub nom., Associated Gas Distribution v. FERC,* No. 84–1454 (D.C.Cir., filed August 31, 1984).

presented extrinsic evidence challenging the parties' contractual authorization to collect the NGPA rate for stripper well gas.[16] The Chief ALJ based this ruling on an April 23, 1979, letter from United to its producers stating that United's contracts did not require United to pay stripper well rates because the rate of production from a well had never been a criterion for determining rates.[17] United, however, retracted the April 23, 1979, letter in August 1979, four months after it was issued.[18] The Chief ALJ, therefore, ordered an evidentiary hearing to decide the factual question whether the parties intended area rate clauses to authorize collection of stripper well gas prices. The case was assigned to another ALJ (hereinafter "the presiding ALJ").

The presiding ALJ considered the live testimony, deposition testimony, and the documentary evidence presented before issuing an opinion in which the presiding ALJ adopted the suggestion of Commission Staff that this proceeding involved eight types of area rate clauses. The presiding ALJ then construed these eight types of area rate clauses by taking into account both the language of the clauses [19] and the extrinsic evidence presented at the hearing. The presiding ALJ held that clauses types I and IV did not authorize stripper well gas rates. The presiding ALJ, however, further held that the remaining types of clauses (Types II, III, V, VI, VII and VIII) authorized collection of stripper well rates and accordingly dismissed the third-party protests as to those types of clauses.

In Opinion 181, the Commission reversed the presiding ALJ's decision as to types II, III, V, VI, and VII, holding that the producers failed, on burden of proof grounds, to demonstrate by a preponderance of the extrinsic evidence that they intended to authorize collection of stripper well gas rates. In Opinion 181–A, the Commission denied rehearing of Opinion 181, reiterating that the producers had failed to meet their procedural burden. Moreover, the Commission held that its approach did not diverge from this Court's order in *Pennzoil* to apply state law.

The producers now seek review of Opinion 181 and Opinion 181–A in this Court. This Court finds merit to several of the producers' arguments. For the following reasons, the petitions for review are granted, the orders vacated and the proceedings remanded for reconsideration in light of this opinion.

## II. DISCUSSION

### A. *Standard of Review*

In their petitions for review, the producers argue that the Commission erroneously

---

**16.** Stripper well gas is defined in section 108 of the NGPA, 15 U.S.C. § 3318(b), which provides:

(1) General rule.—Except as provided in paragraph (2), the term "stripper well natural gas" means natural gas determined in accordance with section 3413 of this title to be nonassociated natural gas produced during any month from a well if—

(A) during the preceding 90-day production period, such well produced nonassociated natural gas at a rate which did not exceed an average of 60 Mcf per production day during such period; and

(B) during such period such well produced at its maximum efficient rate of flow, determined in accordance with recognized conservation practices designed to maximize the ultimate recovery of natural gas.

**17.** The April 23, 1979, Notice to Producers provided:

At the time that existing contracts containing area rate clauses were executed, the rate of

production from a well was not a criterion in determining a category of gas, and United believes that the parties did not intend that the area rate clause would be triggered by a rate for a category of gas determined by the rate of production from a well. Therefore, United believes that the area rate clause is not contractual authority for paying the rate prescribed by Section 108 of the NGPA.

Joint Appendix at 161; Record at 2235.

**18.** Joint Appendix at 162; Record at 2236.

**19.** In interpreting the language of the contracts, the ALJ relied on the guidelines in Opinion No. 77 for interpreting contracts if the contracting parties disagreed over intent. *See* Opinion No. 77, Independent Oil and Gas Association of West Virginia, Docket Nos. RI74–188 & RI75–21, 10 F.E.R.C. (CCH) ¶ 61,214 (March 4, 1980), *petitions for review dismissed without prejudice, Pennzoil Co. v. FERC,* 645 F.2d 394 (5th Cir. 1981). *See also Pennzoil Co. v. FERC,* 742 F.2d 242 (5th Cir.1984) (connected case).

applied the Order 23 presumption as a matter of law. Moreover, producers assert that the Commission failed to give adequate weight to the ALJ's factual determinations. It has long been settled law that this Court reviews the factual determinations of the Commission under the substantial evidence test.[20] Consequently, the Commission's assertion that this case is governed by the clearly erroneous standard is without merit.

■ The parties, however, dispute the amount of deference the Commission owes the ALJ's factual determinations. The Supreme Court has made it clear that the substantial evidence standard "is not modified in any way when the Board and its [ALJ] disagree." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951). *See NLRB v. Lancer Corp.,* 759 F.2d 458, 461 (5th Cir. 1985); *Dunning v. NASA,* 718 F.2d 1170, 1174 (D.C.Cir.1983); *Saavedra v. Donovan,* 700 F.2d 496, 498 (9th Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 227 (1983). Thus, the Commission may properly resolve an issue on grounds which differ from those upon which the ALJ relied. 5 U.S.C. § 557(b). *See Lancer Corp.,* 759 F.2d at 461; *Mattes v. United States,* 721 F.2d 1125, 1129 (7th Cir.1983); *NLRB v. Seafarers International Union,* 496 F.2d 1363, 1364 (5th Cir.1974). Likewise, the Commission is not strictly bound by the credibility determinations of the ALJ. *Mattes,* 721 F.2d at 1129; *Kirkland v. Railroad Retirement Board,* 706 F.2d 99, 104 (2d Cir.1983); *NLRB v. Bogart Sportswear Manufacturing Co.,* 485 F.2d 1203, 1210 (5th Cir.1973).

Nevertheless, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight," *Universal Camera Corp.,* 340 U.S. at 488,

71 S.Ct. at 464, including determinations by the ALJ which differ from the agency's decision. 340 U.S. at 493; 71 S.Ct. at 467. *See Lancer Corp.,* 759 F.2d at 451; *Kirkland,* 706 F.2d at 104; *Saavedra,* 700 F.2d at 498. Consequently, "when the ultimate determination of motive or purpose hinges entirely upon the degree of credibility to be accorded the testimony of interested witnesses, 'the credibility findings of the [ALJ] are entitled to special weight and are not to be easily ignored.'" *Ward v. NLRB,* 462 F.2d 8, 12 (5th Cir.1972) (quoting *Russell-Newman Manufacturing Co. v. NLRB,* 407 F.2d 247, 249 (5th Cir.1969)). *See Kirkland,* 706 F.2d at 103–04; *Saavedra,* 700 F.2d at 498. Therefore, when the Commission has rejected the credibility determinations of the ALJ, the Court subjects the record to particular scrutiny. *See Kirkland,* 706 F.2d at 104; *Bogart Sportswear,* 485 F.2d at 1210; *Ward,* 462 F.2d at 12 & n.5. Review is heightened not because the standard differs but because evidence supporting a conclusion is likely to be less substantial when the ALJ's conclusion differs from that of the agency. *Universal Camera Corp.,* 340 U.S. at 496–97, 71 S.Ct. at 469; *Ward,* 462 F.2d at 12 & n.5.

■ Unlike factual findings, questions of law are freely reviewable by the courts, and courts are under no obligation to defer to the agency's legal conclusions. 5 U.S.C. § 706. *Coca-Cola Co. v. Atchison, Topeka and Santa Fe Railway Co.,* 608 F.2d 213, 218 (5th Cir.1979). "This is particularly true when the decision of the agency is based on an interpretation of a judicial decision that in turn construes the Constitution or a statute." *Charter Limousine, Inc. v. Dade County Board of Commissioners,* 678 F.2d 586, 588 (5th Cir.1982).

■ In their petitions for review, the producers assert that the Commission

---

**20.** *See* 15 U.S.C. § 3416. Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); *Air Products & Chemicals,*

*Inc. v. FERC,* 650 F.2d 687, 695 (5th Cir.1981). Substantial evidence is something less than the weight of the evidence, and the fact that two inconsistent conclusions may be drawn from the evidence does not prevent a finding from being supported by substantial evidence. *Consolo,* 383 U.S. at 620, 86 S.Ct. at 1026.

failed to give adequate weight to the language of the contracts and the parties' assertion of mutual intent. Moreover, the producers argue that the Commission gave undue weight to the April letter submitted by protestors to rebut the Order 23 presumption. This Court agrees that the Commission so erred. The Commission's error stems from a misapprehension concerning the nature and effect of the presumption created which led the Commission to erroneously decide this case on procedural grounds. For similar reasons, the Commission erroneously refused to interpret the contracts at issue in these proceedings. These are errors of law and freely reviewable. Furthermore, the Commission erroneously refused to give proper weight to the credibility determinations of the presiding ALJ which leads this Court to question whether the Commission's factual findings are supported by substantial evidence. For these reasons, as more fully articulated below, the decision of the Commission is vacated and the proceedings remanded for reconsideration in light of this opinion.[21]

### B. *The Order 23 Presumption*

In *Pennzoil,* this Court affirmed the Commission's use of a rebuttable presumption in favor of the contracting parties' mutual interpretation "as a matter of contract law," 645 F.2d at 392, noting that "[r]ebuttable presumptions serve as burden-shifting devices...." *Id.* This Court characterized the presumption as follows:

> The presumption in favor of [the contracting parties' mutual] interpretation is the same as that which arises from a prima facie case: it imposes on the party against whom it is directed the burden of going forward with substantial evidence to rebut or meet the presumption, but does not shift the burden of persuasion. Therefore, protestors need not prove the lack of contractual authority, but only produce some evidence to the contrary.

*Id.* (citing Fed.R.Evid. 301).

Contrary to the Commission's present approach, this Court clearly adopted a "bursting bubble" theory of presumptions when it affirmed the Order 23 presumption. Under the Thayer[22] or "bursting bubble" theory of presumptions, the *only* effect of a presumption is to shift the burden of producing evidence with regard to the presumed fact.[23] If the party against whom the presumption operates

---

**21.** As the Supreme Court has stated, an agency's decision must be upheld on the ground upon which the agency acted. *NLRB v. Enterprise Ass'n. of Steam, Pipefitters Local 638,* 429 U.S. 507, 522 n. 9, 97 S.Ct. 891, 900 n. 9, 51 L.Ed.2d 1 (1977); *SEC v. Chenery Corp.,* 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). Moreover:

> When an administrative agency has made an error of law, the duty of the Court is to "correct the error of law committed by that body, and, after doing so to remand the case to the [agency] so as to afford it the opportunity of examining the evidence and finding the facts as required by law." *ICC v. Clyde S.S. Co.,* 181 U.S. 29, 32–33, 21 S.Ct. 512, 514, 45 L.Ed. 729 (1901).

*Pipefitters Local 638,* 429 U.S. at 522 n. 9, 97 S.Ct. at 900 n. 9.

**22.** *See infra* note 24.

**23.** "[A] presumption is a standardized practice, under which certain facts [the base facts] are held to call for uniform treatment with respect to their effect as proof of other facts [the presumed facts]." McCormick's Handbook of the Law of Evidence § 342, at 803 (E. Cleary 2d ed.

1972 & Supp.1978) [hereinafter cited as *McCormick on Evidence* ].

In the instant case, the presumed fact is that the contracts between the producers and United authorize collection of NGPA rates, including stripper well gas rates. Throughout this opinion, the presumed fact is referred to as "contractual authorization." To establish their entitlement to the presumption, the parties to the contract introduced evidence of the base fact by representing that they mutually intended at the time of contracting to authorize collection of such rates. This base fact, hereinafter referred to as "the parties' assertion of mutual intent," entitled the producers and United to the benefit of the presumed fact of contractual authorization. The protestors, in turn, introduced substantial evidence on the issue of contractual authorization in the form of the April 23, 1979, letter in which United denied that its contracts authorized collection of stripper well rates. This rebuttal evidence challenged the presumed fact, contractual authorization, and also challenged the base fact by calling into question the credibility of the parties' assertion of mutual intent.

produces evidence challenging the presumed fact, the presumption simply disappears from the case.[24] In the instant proceedings, once the third-party protestors met their burden of production, the presumption completely disappeared leaving the factual issue of intent to be resolved at the hearing before the presiding ALJ.

The Commission committed three fundamental errors in its application of the presumption. First, the Commission failed to give *any* further evidentiary weight to the parties' assertion of mutual intent. Second, the Commission gave undue weight to the rebuttal evidence, here the letter of April 23, 1979. Finally, the Commission failed to give evidentiary weight to the language of the contracts and in so doing erroneously refused to construe the contracts involved in this proceeding.

### 1. *The Parties' Assertion of Mutual Intent*

■ First, the Commission erroneously refused to give any evidentiary weight to the parties' assertion of mutual intent beyond the initial proceeding before the Chief ALJ. The Commission stated numerous times in both Opinion 181 and Opinion 181–A that the parties' assertion of mutual intent (the base fact) had been *negated* by the April 23, 1979, letter.[25] As a matter of law, this misstates the effect of rebuttal

evidence on the presumption and the evidence supporting it.

The base fact (here the assertion of mutual intent) which establishes the presumed fact (here contractual authorization) simply is not negated by the rebuttal evidence. It does not follow that the evidentiary basis underlying the presumption is negated merely because the third-party protestors submitted evidence sufficient to rebut the presumption. Granted, the presumption is dispelled, but the underlying evidence remains in the case. A fact finder could still credit the parties' assertion of mutual intent, which is probative of contractual authorization independent of the Order 23 presumption, over the third-party protestors' evidence because the protestors' evidence is simply evidence from which a reasonable person could, but is not required to, infer that contractual authority does not exist. See *infra* p. 1138 & note 27.

As stated by one leading scholar, "presumptions are frequently created in instances in which the basic facts raise a natural inference of the presumed fact." This natural inference may be sufficient to create a fact question, "despite the existence of contrary evidence and despite the resultant destruction of the presumption, ... not because of the presumption, but because of the natural inference flowing from the plaintiff's showing...." *McCormick on Evidence, supra* note 23, § 345(A), at 821.[26]

---

**24.** *See, e.g.,* 10 J. Moore, H. Bendix, M. Waxner, D. Epstein, K. Harper & G. Grotheer, Moore's Federal Practice § 301.04[2]–[4.–1], at III–19–22 (2d ed.1985 & Supp.1985–86) (citing Thayer, *A Preliminary Treatise on Evidence at the Common Law,* at 352 (1898)) [hereinafter cited as *Moore's Federal Practice* ]; *McCormick on Evidence, supra* note 23, § 345(A), at 821; 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5122, at 564 & nn. 49–50 (1977 & Supp.1985) [hereinafter cited as *Wright & Graham*]. *See also In re Yoder Co.,* 758 F.2d 1114, 1118–20 (6th Cir.1985); *Legille v. Dann,* 544 F.2d 1, 5–7 (D.C.Cir.1976).

This position is consistent with the position finally adopted in Rule 301 of the Federal Rules of Evidence. *See, e.g.,* 10 *Moore's Federal Practice, supra,* § 301.04[4.–1], at III–22; *McCormick on Evidence, supra* note 23, § 345, at Supp. 105. *But cf.* 21 *Wright and Graham, supra,* § 5126, at 608–10 (interpreting Fed.R.Evid. 301 as provid-

ing that a rebutted presumption still suffices to carry the issue to the jury). At least three circuits, including this Circuit, have adopted the view that Fed.R.Evid. 301 adopts the Thayer "bursting bubble" theory of presumptions. *See In re Yoder Co.,* 758 F.2d at 1119; *Reeves v. General Foods Corp.,* 682 F.2d 515, 522 n. 10 (5th Cir.1982); *Legille,* 544 F.2d at 6–7.

**25.** *See, e.g.,* Opinion No. 181, 24 F.E.R.C. at 61,218, 61,219 & n. 6, 61,221; Opinion No. 181–A, 27 F.E.R.C. at 61,371 ("Before a hearing will be held such representations [of mutual intent] must have been *negated* by reliable and probative extrinsic evidence.").

**26.** In a Texas case of some vintage, the court stated this principle as follows: "We agree ... that a presumption, as such, is not evidence and that it vanished as such in view of the opposing evidence; but *we do not agree that the evidentia-*

### 2. *The Effect of the Rebuttal Evidence*

■ Second, as a corollary to the first error, the Commission thereafter gave undue weight to the April 23, 1979, letter for at least two reasons. As previously noted, and discussed in more detail *infra,* the April letter did not negate the parties' assertion of mutual intent. Rather, it constituted some evidence of lack of contractual authority. In addition, the letter was not necessarily credible.

The third-party protestors' burden of production has been phrased a number of ways. In Order 23–B, the Commission stated that a third party must show in its protest "evidence sufficient to show lack of contractual authorization...." Order No. 23–B, 44 Fed.Reg. 38,834, 38,836 (1979). On rehearing of Order 23–B, the Commission further clarified the third-party protestors' showing: "That showing must involve more than a 'scintilla' of evidence; it must be such that a reasonable [person] could infer that contractual authority does not exist." Order on Rehearing of Order No. 23–B, 44 Fed.Reg. 48,174, 48,175 (1979). It is this formulation that this Court affirmed in *Pennzoil.* 645 F.2d at 392.

In Order 77, however, the Commission rearticulated the third-party protestors' burden in such a manner as to necessarily place undue weight on the evidence presented by the protestors if the protestors successfully obtained a further hearing before a presiding ALJ. The Commission stated:

> [T]he commission will find contractual authorization to collect NGPA rates unless the express terms of the contract exclude rates promulgated by statute *or the protest ... contains reliable and probative extrinsic evidence which, if true, would specifically contradict the*

*mutual interpretation of the parties and be dispositive of the case.*

Opinion No. 77 at 61,400 (emphasis added; footnote omitted). From this reformulation, the Commission concluded in the present proceeding that the protestors' evidence must negate the contracting parties' mutual assertion of intent before a hearing will be held. Opinion 181–A at 61,371.

This Court notes at the outset that there is a marked difference between "substantial evidence," *Pennzoil,* 645 F.2d at 392, from which a "reasonable [person] could infer that contractual authority does not exist," 44 Fed.Reg. at 48,175, and "reliable and probative extrinsic evidence which, if true, would specifically contradict [or negate] the mutual interpretation of the parties and be dispositive of the case." Opinion No. 77 at 61,400.

Under the Thayer or "bursting bubble" theory of presumptions, the presumption is dispelled upon the "introduction of evidence which would support a finding of the nonexistence of the presumed fact...." 10 *Moore's Federal Practice, supra* note 24, § 301.04[2] at III–19 (citing Thayer, *A Preliminary Treatise on Evidence at the Common Law,* at 352 (1898)). Professor Morgan, in contrast, adopted the position that a " 'presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence.' " *Id.* (quoting Morgan, *Instructing the Jury Upon Presumptions and Burden of Proof,* 47 Harv.L.Rev. 59 (1933)). The Commission's rearticulation of the Order 23 presumption more closely follows Morgan's theory, a theory rejected by this Court in *Pennzoil* and by Congress in its adoption of Federal Rule of Evidence 301.

---

*ry facts upon which it was established, could no longer be considered by the trier of the fact." Southland Life Ins. Co. v. Greenwade,* 138 Tex. 450, 159 S.W.2d 854, 857 (1942) (emphasis added). *See McCormick on Evidence, supra* note 23, § 345, at 821–22 & n. 42; IX Wigmore on Evidence § 2491 (Chadbourn rev. 1981) (the legal consequence of the presumption being removed, the inference, as a matter of reasoning, may still remain).

*Accord in re Yoder Co.,* 758 F.2d at 1119 n. 8 ("The facts giving rise to the presumption often give rise to an inference that remains and may still be considered by the factfinder."); *Legille,* 544 F.2d at 9 & nn. 52–53 ("The facts giving rise to the presumption would also have evidentiary force, and as evidence would command the respect normally accorded proof of any fact.").

*See supra* note 24, at 1137.[27] Clearly, the April 1979 letter did not *negate* the parties' mutual assertion of intent as a matter of law. At most, it was evidence sufficient to support a finding of the lack of the presumed fact of contractual authority; it did not compel such a finding.

Additionally, the producers challenged the credibility of the April 1979 letter. For example, the producers demonstrated that United retracted the April letter in August. Moreover, testimony indicated that the April letter represented a shift in United's previous policy and even may have been a breach of United's negotiator's promises to specific producers. On the other hand, significant evidence tended to establish that United wrote the August letter to maintain a working relationship with United's producers and because United had obtained certain producer consessions regarding production related costs. Thus, a trier of fact faced substantial evidence in support of either interpretation of the April letter.

The Commission, however, failed to address the factual inquiry directly. Rather, the Commission decided this case on procedural grounds, holding that producers failed to meet their burden of proof. *See* Opinion No. 181 at 61,220, 61,221; Opinion No. 181-A at 61,368, 61,370.[28] The ALJ, in contrast, answered the factual inquiry. As to at least one type of area rate clause [Type II Clauses], the ALJ specifically held that the April 1979 letter did not constitute reliable and probative evidence which contradicted the parties' assertion of mutual intent.[29] The Commission, however, gave the letter undue weight simply by holding that it was credible and accurate without adequate reference to the ALJ's credibility determination.[30] This Court does not hold that the Commission must accept the ALJ's credibility determination on remand. Nevertheless, it constitutes part of the record which the Commission cannot ignore. See *supra* at p. 1135.[31]

27. Nevertheless, Opinion 77 is not before this Court for review in the present proceeding and this Court declines to hold that the recharacterization of the presumption affirmed by this Court in *Pennzoil* is necessarily erroneous for all purposes. Rather, we limit our discussion of Opinion 77 to the effect it has on the weight properly afforded to the evidence used to rebut the Order 23 presumption in the present protest proceedings.

28. At oral argument, the Court inquired whether the Commission made a factual determination or whether the Commission decided this case on procedural grounds. The Commission's responses to those questions, the Commission's brief to this Court, and the language of Opinions 181 and 181-A convince this Court that the Commission decided this case on procedural grounds.

29. Initial Decision, 20 F.E.R.C. at 65,226–27 ("With respect to these clauses [Type II Clauses], there is no reliable and probative evidence contradicting the parties' mutual interpretation.").

30. The Commission stated:
    One point need be made concerning this issue. On mimeo page 19 of his initial decision the judge finds that no reliable and probative evidence *exists* contradicting the parties' interpretation. Initially, this statement is incorrect. United's April 23, 1979 "Notice to Sellers" is reliable and probative extrinsic evidence contradicting such intent.

Opinion No. 181-A at 61,369 (emphasis in original). The Commission simply failed to note that the ALJ had discussed the April letter in detail as it related to Type I clauses. Thus, the ALJ was acutely aware of the *existence* of the letter, and chose to discredit it as it related to Type II Clauses. The Commission erroneously failed to give any weight to this credibility determination even though its opinion explicitly recognized that the ALJ's findings on the weight of the evidence, particularly credibility determinations, are due great deference. Opinion No. 181-A at 61,370. Contrary to the Commission's position on appeal, the ALJ found that the extrinsic evidence was ambiguous as to only two types of clauses (Type I and IV). The Commission erroneously construed this finding, holding that the ALJ determined, as a whole, that United's chief negotiator's testimony was not credible and that the evidence, as a whole, was inconclusive.

31. An agency decision may be set aside if it is arbitrary and capricious, 5 U.S.C. § 706(2)(A), and a failure to consider all the relevant factors and provide a reasoned basis for the agency's decision may render an opinion arbitrary and capricious. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). *See Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

### 3. *Language and Construction of the Contracts*

▇▇▇▇ Third, the Commission erroneously refused to consider the language of the contracts as evidence of intent and further erred by then refusing to construe the contracts. The starting point for determining the effect of an area rate clause must be the language of the contract. The Court must consider the language of the contract, its purposes and its commercial context in order to resolve the ultimate question of contractual authorization. *Pennzoil*, 645 F.2d at 388 (citing *Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d 1281, 1288–89 (10th Cir.1979); *Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040, 1046 (5th Cir.1971); U.C.C. § 1–205, Official Comment 1, § 2–202 & Official Comments 1 & 2). The extrinsic evidence does not stand alone. Rather, it "is relevant to prove a meaning to which the language of the instrument is reasonably susceptible...." *Pennzoil*, 645 F.2d at 388.

In the present proceedings, the Commission reversed the ALJ in part because the ALJ construed the language of the contracts. Opinion No. 181 at 61,219. In Opinion 181–A, the Commission restated its position:

> [In Opinion 181] [t]he Commission did not hold that the contract language could not be considered as an evidentiary tool. The Commission did not hold, however, that ... because the contract language was ambiguous that it must be explained or clarified through extrinsic evidence. The contract language itself cannot be dispositive in such a situation. Thus, the Commission reversed the judge on his approach that an independent construction of the contract language was dispositive. The Commission did not hold that the contract language could not or should not be considered. The contract language here, however, is ambiguous and therefore must be clarified by extrin-

sic evidence in order to be useful in resolving this proceeding.

27 F.E.R.C. at 61,369.

Read together, and as a whole, Opinions 181 and 181–A clearly require the contracting parties to establish intent *solely* by extrinsic evidence. Such a proposition flies in the face of well established contract law. Although the Commission concedes in Opinion 181–A that there is evidentiary value in the language of the agreements, the Commission's disposition of the proceeding belies that statement. The Commission's opinions fail to note the language of the contracts, which contain no limiting language, or make any attempt to construe the language in light of the extrinsic evidence. This was error.

In fact, the Commission clearly stated that interpretation of the contracts is not the purpose of a third-party protest. In third-party protests, "[t]he Commission will not construe the contract language itself to determine intent if the contract parties cannot prove their mutual intent." Opinion No. 181–A at 61,371. The Commission's position rests on two interrelated grounds. First, the Commission adopted this position because the parties made a mutual representation as to intent which was "negated by reliable and probative extrinsic evidence." *Id.* Second, unlike two-party protest cases in which the central issue is whether the contract authorizes NGPA rates, the central issue in a third-party protest is whether the contracting parties have proved their mutual intent, an evidentiary issue. *Id.*

As noted, this Court strongly disagrees that the evidence produced by the protestors in the initial hearing before the Chief ALJ *negated* the parties' assertion of mutual intent. At most, it constituted *some evidence* that the parties in fact did not intend to authorize collection of stripper well rates. Moreover, this Court also disagrees with the Commission's basic premise that the differences between third-party protests and two-party protests [32] somehow

---

**32.** In two-party protests, the Commission stated that it would "construe the contract language

utilizing the guidelines established in Opinion No. 77 if neither party is able to establish in-

relieve the Commission of its obligation to actually construe the contracts at issue in a third-party protest.

■ As understood by this Court, and clearly indicated in *Pennzoil*, the central purpose of the hearing before the presiding ALJ is to determine the factual question of intent. Intent, however, is relevant only as it relates to the proper interpretation of the contracts. Once the presumption disappears, the Commission is obligated to construe the contracts to determine whether they authorize NGPA rates or not, taking into account the language of the contracts and *all* the extrinsic evidence of intent presented, including the parties' assertion of mutual intent.

As stated by this court in a somewhat different context:

> In interpreting an ambiguous contract, a court does not simply determine the parties' intent; it makes a legal conclusion about the meaning of the contract based on evidence of the parties' intent. The words of the contract establish a universe of reasonable interpretations; evidence of the parties' intent guides the [court] in choosing among these possible interpretations.

*Carpenters Amended and Restated Health Benefit Fund v. Holleman Construction Co.*, 751 F.2d 763, 767 n.7 (5th Cir.1985).[33]

■ In large measure, this ultimate resolution involves a fact question[34] that turns on credibility determinations. The Commission must make those difficult credibility determinations and answer the factual inquiry as did the ALJ in this case. It is simply unacceptable for the Commission to avoid the determination by stating that the producers procedurally failed to adduce sufficient evidence to sustain their burden of proof. As a matter of law, the amount of evidence presented by the producers, *if believed*, amply demonstrated contractual authorization under the contracts. In sum, *Pennzoil* requires the Commission to resolve the factual dispute by utilizing the ALJ's approach, or a similar approach, which construes the language of the contracts in light of the extrinsic evidence.

### C. *Application of State Law*

The second major inquiry in the instant case is whether the Commission properly applied state law to the contract interpretation issues presented to it in this protest proceedings. The producers assert that three aspects of the Commission's decision are contrary to relevant state law principles of contract construction. First, the producers assert that the Commission failed to properly consider evidence of a course of performance between United and its producers. Second, the producers assert that the Commission failed to find, and then apply, evidence of a usage of trade. Third, the producers contend that the August 1979 retraction letter constituted a modification of their contracts. In addition, several producers, in separate briefs to this Court, assert that the Commission failed to individually address their conten-

tent[,]" because the parties disagree over the meaning of the clause and their intent at the time of its execution. Opinion No. 181–A at 61,371. Therefore, "the language of the contract is the only reliable evidence of intent and the Commission will independently construe it in order to resolve the case of the evidence is inconclusive." *Id. See, e.g.*, Opinion No. 168, Oklahoma Natural Gas Gathering Co., Docket Nos. GP80–37–000 and GP80–83–000, 23 F.E.R.C. (CCH) ¶ 61,308 (June 1, 1983). In large measure, it is apparent to this Court that the Commission's difference in treatment between third-party and two-party protests stems from its construction of the Order 23 presumption. Once the presumption disappears, the central question presented in third-party protests be-

comes the same as in two-party protests—the proper construction to be given the contracts.

**33.** *See generally Richland Plantation Co. v. Justiss-Mears Oil Co.*, 671 F.2d 154, 156 (5th Cir. 1982) (applying Texas law); *Calcon, Inc. v. Young Companies, Inc.*, 322 So.2d 883, 885–86 (La.App. 1st Cir.1975); *Barnett v. Getty Oil Co.*, 266 So.2d 581, 586 (Miss.1972).

**34.** *Richland Plantation Co.*, 671 F.2d at 156; *Kemp v. Hudnall*, 423 So.2d 1260, 1261 (La.App. 1st Cir.1982), *writ denied*, 428 So.2d 474 (La. 1983); *Dennis v. Searle*, 457 So.2d 941, 945 (Miss.1984).

tions that a course of performance or dealing existed between United and them, even if it did not exist between United and all producers, and that the specific actions of United in relation to their companies constituted an amendment to their contracts.

In *Pennzoil*, this Court held that "specific determinations of contractual authority in the protest procedures must take account of and follow any differences with general contract law that the appropriate state contract law may have." *Pennzoil*, 645 F.2d at 383–84 (footnote omitted); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This Court held that "the appropriate contract law to apply is the law that would govern the parties' dealings were there no regulation at all of the contract's subject matter." 645 F.2d at 387 (footnote omitted).

Nevertheless, this Court noted that the Commission need not undertake an extensive choice of law analysis in each case because "it is reasonable to put the burden on the parties to inform FERC if the state law that should apply is any different from the general principles that FERC utilizes." *Id.*

Since the Uniform Commercial Code applies to natural gas sales as the sale of goods, U.C.C. § 2–107(1), and all states except Louisiana have adopted the UCC, variations between state law and general principles are likely to be few. When such differences appear, however, FERC must follow the state law. *Id.*

Although this Court indicated that the Commission could assume that a specific state's contract law was the same as general contract principles, this Court further made clear that those general principles included the UCC. This Court did not hold that the Commission was entitled to disregard the UCC and the general principles therein and to substitute its own version of "general contract law" for the principles enunciated in the UCC. In light of this, this Court turns to the three central concerns expressed by the producers.[35]

### 1. Course of Performance

U.C.C. § 2–208(1) defines course of performance.[36] At issue here are two questions of interpretation of the UCC: (1) whether course of performance includes performance prior to the advent of NGPA stripper well gas rates, and (2) whether it includes the period of time from April 1979 to August 1979 when the parties disagreed over whether the contracts authorized collection of stripper well gas rates.

The Commission asserts that there could be no course of performance relevant to stripper well rates prior to the NGPA because volumetrically based rates were not used previously. Thus, the Commission asserts that the only relevant course of performance runs from April 1979, when United stated that stripper well rates were not authorized, until the hearing.[37] According

---

**35.** The Commission's assertion that the producers failed to demonstrate applicable state law is completely without merit. *See* Record at 9613–16. *See also* Initial Decision, 20 F.E.R.C. at 65,224.

**36.** U.C.C. § 2–208(1) provides:
Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.
Texas has adopted this provision, Tex.Bus. & Com.Code Ann. § 2.208(a); *see Southwest Industrial Import & Export, Inc. v. Borneo Sumatra Trading Co., Inc.*, 666 S.W.2d 625, 629 (Tex.

App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.), as has Mississippi, Miss.Code Ann. § 75-2–208(1); *see Delta Wild Life & Forestry, Inc. v. Bear Kelso Plantation, Inc.*, 281 So.2d 683, 686 (Miss.1973). Louisiana law is in accord. *See* La.Civ.Code Ann. art. 1956 (West 1977); La.Civ. Code Ann. art. 2045 and 2053 (West 1984) (1984 amendment and reenactment); *Kenner Industries, Inc. v. Sewell Plastics, Inc.*, 451 So.2d 557, 560 (La.1984).

**37.** The Commission asserts that United's position expressed in the April 1979 letter represented United's initial approach to whether its contracts authorized stripper well rates. This finding wholly ignores United's January 1979 Commission filing in the Order 23 rulemaking in which United indicated that its area rate clauses triggered rates established under section 108. Record at 2242–49. See *supra* note 31.

to the Commission, because United reversed its position during that time period, course of performance evidence was inconclusive and entitled to little weight.

The producers assert, however, that they presented evidence tending to show that United consistently paid higher rates pursuant to area rates clauses even when those rates were based on previously unused methods of calculation.[38] Producers argue that this evidence demonstrates a course of performance in which United paid the highest rate allowed by law regardless of the criteria used to calculate those rates. Consequently, producers argue, such course of performance evidence is entitled to significant weight on the issue whether these contracts also authorized collection of stripper well rates. In addition, the producers assert that the Commission erred in considering the time period from April to August 1979 because the producers did not acquiesce in United's policy not to pay stripper well rates and, pursuant to the UCC, a course of performance can only be established by evidence that both parties accepted the performance or acquiesced in it without objection.

First, the Commission's view of the relevant time period is too narrow. Clearly, whether United paid higher rates based on new pricing criteria over a long time span is relevant to the question whether present contracts authorize collection of a higher rate based on yet another new criterion—the volume of production. *Pennzoil*, 645 F.2d 389 n. 59. Such course of performance, however, is not conclusive, and the fact that United initially did not agree to pay stripper well rates is certainly relevant as well. *See Paragon Resources, Inc. v. National Fuel Gas Distribution*

*Corp.*, 695 F.2d 991, 996 (5th Cir.1983) (evidence of subjective intent properly considered when contract language ambiguous). Thus we agree with the Commission that it would be improper to disregard United's position from April to August 1979. That evidence is not, however, entitled to the same weight as course of performance evidence because the producers did not acquiesce in that policy.[39]

Consequently, to the extent the Commission failed to follow the definition of course of performance, as that concept is applied under relevant state law and the UCC generally, the Commission erred. Of course, course of performance evidence is merely one type of evidence which the parties may present to prove their intent, and it is entitled only to that weight to which the fact finder determines it is entitled in light of all other evidence presented.

### 2. *Usage of Trade*

The Commission held that the producers presented no evidence of usage of trade. Opinion No. 181 at 61,221; Opinion No. 181–A at 61,372. Plainly, this is incorrect. Nevertheless, the Commission did not err in holding that the producers had not established, as a matter of fact, a usage of trade upon which they could rely. U.C.C. § 1–205(2) defines usage of trade as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question."[40] Usage of trade is a question of fact. *Id.*

The Commission held that no evidence of usage of trade had been presented based on the ALJ's finding in that respect regarding one type of contract analyzed. Al-

---

**38.** The producers argue that United paid higher rates based on the following criteria that previously had not been used: (1) nationwide rates, (2) rollover rates, (3) small producer rates, (4) rates based on the well commencement date, and (5) other rates established in the NGPA. Joint Initial Brief of Producer Petitioners and Intervenors at 11, 38.

**39.** U.C.C. § 2–208. *See Smyth v. Board of Comm'rs*, 87 F.Supp. 138, 143 (E.D.La.1949),

*aff'd*, 187 F.2d 11 (5th Cir.), *cert. denied*, 342 U.S. 821, 72 S.Ct. 39, 96 L.Ed. 621 (1951).

**40.** *See* La.Rev.Stat.Ann. § 10:1–205(2); La.Civ. Code Ann. art. 2053 (West 1984) (1984 amendment and reenactment); Miss.Code Ann. § 75–1–205(2); Tex.Bus. & Com.Code Ann. § 1.205(a). *See also Kenner Industries, Inc.*, 451 So.2d at 560; *Galaxy Boat Mfg. Co. v. East End State Bank*, 641 S.W.2d 584, 586–87 (Tex.App.—Houston [14th Dist.] 1982, no writ).

though evidence was presented which might tend to show a usage of trade, the Commission's determination that one was not demonstrated as a matter of fact is supported by substantial evidence. Moreover, the Commission's conclusion is consistent with previous decisions by it on the identical point.[41]

### 3. Amendment of the Contracts

The producers assert that under state law, particularly the UCC, a contract can be modified by the mutual agreement of the parties. Further, the producers argue that the August retraction letter constituted such an agreement. The Commission, however, asserts that there was no contract amendment because the August letter did not constitute a formal offer and there was also no formal acceptance, citing *Schwartz v. NMS Industries, Inc.*, 517 F.2d 925, 928–29 (5th Cir.1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). Further, the Commission asserts that the parties' course of conduct requires amendments to be in writing.

U.C.C. § 2–204(1) provides that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." U.C.C. § 2–209(1) provides that a contract modification needs no consideration to be binding. Finally, U.C.C. § 2–208(3) provides that course of performance shall be relevant to show a modification of any term inconsistent with the course of performance.[42]

In *Pennzoil*, this Court noted that the parties' subsequent conduct might modify the original terms of a contract. *Pennzoil*, 645 F.2d at 393 n. 69. *See Louisiana Power & Light Co. v. FERC*, 587 F.2d 671, 676 (5th Cir.1979); *Sam Rayburn Dam Electric Cooperative v. FPC*, 515 F.2d 998, 1009 (D.C.Cir.1975), *cert. denied*, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). Moreover, such a modification can occur if the buyer unconditionally pays the higher price requested by the seller, such as stripper well rates in the instant case. *Pennzoil* 645 F.2d at 393 n. 69.

Thus, if United began to pay stripper well rates after the August retraction letter and continued to do so, such conduct would most likely constitute an amendment or modification to a contract that otherwise would not permit recovery of those higher rates. Moreover, the retraction letter alone under some states' law might constitute a modification.

■ This Court, however, declines to address whether such a modification occurred in the context of the individual contracts at issue here for a number of reasons. First, it is unclear whether statutes of frauds in the various states require a writing evidencing the modification and whether the August 1979 letter would meet the requirement.[43] Moreover, United's course of conduct with individual producers may vary and the Commission is better suited on remand to address those differences. We note, however, that the UCC requires no "formal" offer and acceptance for a contract modification to be effective as between the parties. *Schwartz* is not to the contrary. *See supra* note 42 and accompanying text.

---

**41.** Equitable Gas Co., Docket No. GP80–9–001, 23 F.E.R.C. (CCH) ¶ 61,015 (April 6, 1983).

**42.** Miss.Code Ann. §§ 75–2–204(1), 75–2–208(3), 75–2–209(a); Tex.Bus. & Com.Code Ann. §§ 2.204(a), 2.208(c), 2.209(a). *See generally Southern Scrap Material Co. v. Commercial Scrap Materials Corp.*, 239 La. 958, 120 So.2d 491, 494 (1960); *Watson v. Haik*, 393 So.2d 173, 174 (La.App. 1st Cir.1980); *St. Louis Fire & Marine Ins. Co. v. Lewis*, 230 So.2d 580, 581–82 (Miss.1970); *Stowers v. Harper*, 376 S.W.2d 34, 39 (Tex.Civ.App.—Tyler 1964, writ ref'd n.r.e.).

**43.** U.C.C. § 2–209(3) requires that the parties comply with the statute of frauds provision, U.C.C. § 2–201, if the contract as modified falls within its provisions. U.C.C. § 2–201 requires a writing evidencing an agreement for a sale of goods for the price of five hundred dollars or more. Thus, it appears that a writing is required. However, the issue presented is whether the August 1979 letter, alone or in combination with the existing written contract, meets that requirement under each applicable state's law.

#### 4. *Individual Arguments of the Producers*

Several producers submitted individual briefs to this Court detailing evidence of a course of performance or course of dealing between United and that specific producer on which that producer is entitled to rely in attempting to establish its claim that its contract authorizes collection of stripper well rates. In addition, individual producers assert that certain actions by United amounted to a modification of their contract with United. The Commission has inadequately addressed these individual contentions.

In *Pennzoil,* this Court stated that "[a]scertaining the parties' intent is a matter of case-by-case adjudication not susceptible to considerations of uniformity such as exist in a rulemaking proceeding." 645 F.2d at 386. Moreover, "identical language in different contracts could be interpreted to have different meanings" depending on the circumstances of its execution. *Id.* In the instant case the producers' individual contentions have not been adequately addressed. On remand, the Commission must consider and determine the individual contentions of the producers which were timely raised before the Commission.

### III. CONCLUSION

The Commission misconstrued the presumption affirmed by this Court in the *Pennzoil* decision. Rather than adopting a "bursting bubble" theory of presumptions, the Commission viewed the rebuttal of the Order 23 presumption as completely negating the parties' assertion of mutual intent. This led the Commission to place undue weight on the protestors' rebuttal evidence and no weight on the parties' mutual interpretation. Finally, the Commission refused to consider the language of the contracts as evidence of intent and erroneously refused to construe the contracts, resting its decision instead on procedural grounds. In contrast, this Court's *Pennzoil* decision clearly requires the Commission to decide the factual question of intent so that the Commission may then determine whether the contract authorize collection of NGPA rates, the ultimate purpose of the hearing. These errors of law require that this Court remand these proceedings for reconsideration.[44]

Finally, this Court reiterates that the Commission is bound to apply state law principles of contract construction to its interpretation of these contracts. This applies particularly to course of performance evidence, usage of trade evidence, and evidence of contract modifications. Furthermore, as noted in *Pennzoil,* individual producers are entitled to have their particular arguments addressed on an individual basis by the Commission and in accordance with the applicable state's contract law.

The petitions for review are granted. Opinions and Orders Nos. 181 and 181–A are VACATED and the proceedings REMANDED.

---

**44.** This Court notes that the ALJ's approach to this mammoth proceeding was eminently reasonable and practical and that it might serve as a model on remand. Furthermore, we reiterate that the Commission failed to give the ALJ's credibility determinations the weight to which they were entitled under established precedent.